UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ROBERT LEWIS SMITH, | ) | CASE NO. ED CV 10-1119-GW (PJW) |
| | ) | |
| Petitioner, | ) | AMENDED FINAL REPORT AND |
| | ) | RECOMMENDATION OF UNITED STATES |
| v. | ) | MAGISTRATE JUDGE |
| | ) | |
| DERRAL G. ADAMS, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | |

This Amended Final Report and Recommendation is submitted to the Hon. George H. Wu, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California. For the reasons discussed below, it is recommended that the Petition be denied and the action be dismissed with prejudice.

I.

SUMMARY OF PROCEEDINGS

A. State Court Proceedings

In December 1992, Petitioner was convicted after a jury trial in San Bernardino County Superior Court of five counts of sexual assault, seven counts of forced oral copulation, and one count of first degree residential burglary. (Petition at 2.) In January 1993, the court

sentenced him to 136 years in prison. (Lodgment No. 6 at 357.) Petitioner appealed to the California Court of Appeal, which affirmed the conviction in December 1994. (Lodgment Nos. 8, 10-12.) He then filed a petition for review in the California Supreme Court, which was denied on July 12, 1995. (Lodgment Nos. 14, 15.)

Nearly 14 years later, in June 2009, Petitioner filed a habeas corpus petition in the San Bernardino County Superior Court, followed by habeas petitions in the California Court of Appeal and the California Supreme Court, all of which were denied. (See Attachments to Petition, (state court orders denying habeas corpus petitions).)

B. Federal Court Proceedings

On July 29, 2010, Petitioner, proceeding pro se, filed the instant Petition in this court, pursuant to 28 U.S.C. § 2254, raising the following claims:

1. Petitioner is actually innocent of the sexual assaults.
2. Trial counsel was ineffective.
3. The government illegally destroyed evidence.
4. Habeas counsel was ineffective.

(Petition at 5-6, attached pages.)

On August 4, 2010, the Court issued an order to show cause why the Petition should not be dismissed because it was untimely. Unbeknownst to the Court, Petitioner was never served with that order. When Petitioner failed to respond, on September 21, 2010, the magistrate judge recommended that the Petition be dismissed on statute of limitations grounds. Thereafter, the Court learned that Petitioner had not been served with the order to show cause or the Report and Recommendation and, on November 17, 2010, served them on Petitioner. On February 3, 2011, Petitioner filed an answer and objections to the

1  Report and Recommendation.  On June 27, 2011, the Court issued a
2  "Final Report and Recommendation," again recommending that the
3  Petition be dismissed on the ground that it was untimely.
4      On August 10, 2011, Petitioner filed objections to the Final
5  Report and Recommendation.  In those objections, he alleged, for the
6  first time, that he had been suffering from a mental illness since he
7  was 14, that he was placed on anti-psychotic medications prior to his
8  criminal trial in 1992, and that he had been "off and on
9  [anti-]psychotic medication" ever since his incarceration. (Final
10 Objections at 9.)  Because his allegations, if true, might qualify him
11 for equitable tolling, the Court ordered Respondent to lodge the
12 relevant medical records so that it could consider the issue.  The
13 Court also ordered Petitioner to file a declaration explaining how his
14 alleged mental illness prevented him from filing his Petition on time.
15 Thereafter, Respondent lodged the medical records and other documents
16 relating to Petitioner's mental health treatment and Petitioner
17 submitted a declaration and supporting documents.
18     On February 28, 2013, Respondent lodged additional prison medical
19 records, and on April 22, 2014, trial and appellate records.  Pursuant
20 to Rule 7 of the Rules Governing Section 2254 Cases, the record is
21 expanded to include the supplemental documents.
22                                 II.
23                              DISCUSSION
24 A.   The Statute of Limitations
25     State prisoners seeking to challenge their state convictions in
26 federal habeas corpus proceedings are subject to a one-year statute of
27 limitations.  28 U.S.C. § 2244(d).  Here, Petitioner's conviction
28 became final in October 1995--90 days after the state supreme court

denied review and the time expired for him to file a petition for writ of certiorari in the United States Supreme Court. *See, e.g., Brambles v. Duncan*, 412 F.3d 1066, 1069 (9th Cir. 2005). For prisoners like Petitioner, whose convictions became final prior to the enactment of the statute of limitations in April 1996, the one-year period began in April 1996 and ended a year later in April 1997. *See Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001). Petitioner did not file his Petition until July 2010, more than 13 years after that deadline. Accordingly, absent tolling, the Petition is untimely and must be dismissed.

B. <u>Statutory Tolling</u>

The statute of limitations is tolled during the time "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). The statute of limitations is not tolled between the time a petitioner's conviction becomes final and the date of his first collateral challenge in state court. *See*, *e.g.*, *Thorson v. Palmer,* 479 F.3d 643, 646 (9th Cir. 2007).

Here, Petitioner filed a complete round of habeas corpus petitions in the California courts beginning in June 2009. Because the one-year statute of limitations had long since expired by that time, they did not toll the limitations period. *See Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003) (holding filing of a state petition after federal limitations period has expired has no tolling effect); *Jiminez v. Rice*, 276 F.3d 478, 482 (9th Cir. 2001). Accordingly, statutory tolling does not save the Petition.

C.   Equitable Tolling

The statute of limitations is subject to equitable tolling if a petitioner can show that he has been diligently pursuing his rights but that "extraordinary circumstances" beyond his control prevented him from filing a petition on time. *Bills v. Clark*, 628 F.3d 1092, 1096 (9th Cir. 2010) (citing *Holland v. Florida*, 560 U.S. 631, 649 (2010)). A mental impairment that "in fact caused [a petitioner] to fail to meet the . . . filing deadline" constitutes an extraordinary circumstance. *Laws v. Lamarque*, 351 F.3d 919, 923 (9th Cir. 2003). In order to qualify for equitable tolling based on a mental impairment, a petitioner must show that the impairment (1) was "'so severe that [he] was unable personally . . . to understand the need to timely file . . . a habeas petition,' and (2) 'made it impossible under the totality of the circumstances to meet the filing deadline despite petitioner's diligence.'" *Forbess v. Franke*, 749 F.3d 837, 840 (9th Cir. 2014) (quoting *Bills*, 628 F.3d at 1093).

Here, after careful review of the expanded record, the Court concludes that Petitioner has failed to demonstrate that any mental impairment prevented him from understanding the need to timely file a petition and from actually filing a petition during the relevant period, i.e., April 1997 to June 2009.

It seems clear that Petitioner has suffered from some degree of mental illness in the past. In March 1993, several months after he was sentenced, a California Department of Corrections staff psychologist noted that Petitioner was claiming that he had experienced auditory and visual hallucinations and been hospitalized as a youth. (Petitioner's Declaration, Exh. B.) He was diagnosed with major depression, recurrent, mild. (Declaration, Exh. B.) An

evaluation in August 1996 noted, among other things, that he had a history of marijuana and PCP use and diagnosed him psychotic disorder, not otherwise specified.  (Lodgment No. 1 (hereinafter, "Medical File") at 514-15.)  In particular, Petitioner complained of auditory and visual hallucinations.  In 1998, he alleged that he heard his deceased mother's voice telling him to hurt himself.  (Medical File at 637, 640.)  In 2007, he reported that he experienced auditory hallucinations each year around the anniversary of his mother's death. (Medical File at 452.)

These allegations are undermined, however, by Petitioner's admissions to prison medical staff in July 1998 and October 2000 that he had concocted these claims in order to gain access to prison psychiatric care.  (Medical File at 546, 639.)  Moreover, there is other evidence of manipulative behavior by Petitioner.  In September 1998, prison psychologist Dr. Roy Johnson noted that Petitioner had no signs or symptoms of serious mental illness but, rather, "seem[ed] to be driven by maladaptive traits of personality."  (Medical File at 621.)  In February 2010, Dr. Ernest Wagner opined that "the data received from [Petitioner] is considered highly suspect because of gross inconsistencies between the history that he provides and the history provided by the record."  (Lodgment No. 5 at 173).  Dr. Wagner noted that going forward staff should attempt to rule out malingering and antisocial personality disorder. (Lodgment No. 5 at 174.)

Significantly, the longitudinal medical records show very little in the way of serious mental illness symptoms.  A February 1998 weekly assessment indicated, essentially, that there was nothing psychiatrically wrong with Petitioner.  (Medical File at 623.) Medical notes from February and March 1999 note that Petitioner was

not experiencing any psychiatric issues; his thought and speech were intact; his cognition, thought content, and insight were all within normal limits; and he was able to "advocat[e] for himself quite coherently[.]" (Medical File at 612, 613-15.) A March 1999 mental health assessment described him as a "relatively high functioning individual currently experiencing [a] depressed mood," who might well be exaggerating his mental symptoms. (Medical File at 508, 509.) Between April 1999 and August 2000, few mental health concerns were noted, other than during an incident in October 1999, when Petitioner angrily complained that a medical assistant gave him the wrong prescription and thereafter refused to take any medication for several months. (Medical File at 575, 581.) Between February and July 2000, Petitioner stated that he was doing fine, save for one angry outburst in April 2000. (Medical File at 551-54, 556-60, 563.) In August 2000, Petitioner had another outburst toward a prison doctor; nevertheless, the doctor involved found that Petitioner was in control of his actions and that no hallucinations or psychotic processes were present. (Medical File at 547.)

In October 2000, Petitioner's depression was found to be in full remission. (Medical File at 545.) In February 2001, a progress note reported that he had been off medications since August 2000 without any apparent ill-effect. (Medical File at 542.) Petitioner was described as stable and doing well through July 2001 and was released back into the general prison population in August 2001. (Medical File at 517-23, 525-41.) In December 2003, an evaluation reported that Petitioner was doing fine and off medication. (Medical File at 455.) A November 2004 mental health screening report found no indication of mental illness. (Medical File at 435.) Although Petitioner went on a

brief hunger strike in July 2007, a prison psychologist reported that there was no "serious mental health issue" supporting the strike. (Medical File at 448.) Moreover, in August 2007, psychologist Dr. De Almeida noted that Petitioner was "aware of available resources if he is in need" and "verbalized that he understood and agreed to make use of" those resources if necessary. (Medical File at 426.)

Beginning in January 2008, Petitioner engaged in another hunger strike. (Medical File at 358, 359.) Even so, his thoughts were found to be goal-directed and there was no evidence of thought disorder or perceptual disturbance. (Medical File at 354, 355, 356.) Despite experiencing some feelings of paranoia and depression between March and September 2008, Petitioner was not complaining of hallucinations or any other mental health concerns by November 2008. (Medical File at 338, 342, 350-51, 462.) As noted above, Petitioner filed his first state habeas corpus petition in June 2009.

Thus, the medical records do not support Petitioner's claim that his mental illness made it impossible for him to prepare and file a federal habeas corpus petition between April 1997 and June 2009. At a minimum, the records show that Petitioner did not experience any mental health issues between October 2000 and July 2007. Because the evidence does not support his argument that his mental illness prevented him from filing on time, his request for equitable tolling is denied. *See*, *e.g.*, *Lopez v. Felker*, 536 F. Supp.2d 1154, 1158-59 (C.D. Cal. 2008) (rejecting equitable tolling where records showed depression and allegations of auditory hallucinations, but treatment notes repeatedly indicated inmate was stable and had normal mental status); *Jackson v. McDonald*, 2010 WL 5572742, at *5-8 (C.D. Cal. Dec. 9, 2010) (denying equitable tolling where health records showed

inmate's mood, affect, and thoughts were appropriate and that he was successfully medicated during relevant time period), *adopted by* 2011 WL 97734 (C.D. Cal. Jan. 5, 2011).

### D. Additional Arguments

In general, the statute of limitations begins to run when a petitioner's state conviction becomes final. 28 U.S.C. § 2244. There is an exception for claims that are based on facts that are not known to the petitioner at the time his conviction becomes final. 28 U.S.C. § 2244(d)(1)(D). Under this exception, the limitations period does not begin to run until "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D).

Petitioner claims that, in 2008, he requested the DNA evidence for testing and learned for the first time that, in July 2000, the police destroyed all of the forensic evidence in his case. He claims that this is newly discovered evidence and supports the late filing of his Petition. The Court disagrees.

Petitioner's discovery that police destroyed the evidence in his case eight years after he was convicted and five years after his appeals were exhausted does not support a claim for a later start date to the statute of limitations. This is particularly true where, as here, the documentation and state court transcripts provided by Petitioner indicate that the DNA evidence was destroyed in the routine course of business in accordance with state law.

Petitioner disagrees. (Objections at 4-6.) He argues that, under state law, police are required to "retain all biological material that is secured in connection with a criminal case for the period of time that any person remains incarcerated in connection with

that case," and that they may only dispose of the material after providing notice to the prisoner and others.  Cal. Penal Code § 1417.9(a),(b).  (Objections at 5; see also Answer at 9-11.)  This argument is unavailing.  The Penal Code section that Petitioner relies on was enacted on September 28, 2000, several months after the evidence in this case was destroyed.  Thus, these statutory provisions do not establish that the police acted improperly when they destroyed it.

Petitioner also claims that he is actually innocent and, therefore, the Court should overlook the statute of limitations.  In order to qualify for the actual innocence exception to the statute of limitations, however, a petitioner "must produce sufficient proof of his actual innocence to bring him 'within the narrow class of cases . . . implicating a fundamental miscarriage of justice.'"  *Lee v. Lampert*, 653 F.3d 929, 937 (9th Cir. 2011) (en banc).  A valid claim of actual innocence requires that a petitioner introduce new, reliable evidence, such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence, demonstrating that he is factually innocent.  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  Petitioner has not done so here.

Petitioner's "new evidence" consists largely of conclusory assertions that the DNA evidence proves that he is innocent.  He also relies on one page of the trial transcript wherein an unidentified witness (alleged by Petitioner to be a San Bernardino County crime lab criminalist) testifies that a foreign genetic marker that was present on vaginal swab A-1 "could not have come from Mr. Smith."  (Answer at 3-4; Exh. A.)  Putting aside the issue of the exculpatory value of this testimony, the Court finds that it does not constitute "new"

evidence. This testimony (the context of which is not established) was presented at trial and Petitioner was, nevertheless, found guilty.

Finally, Petitioner has moved to stay his Petition while he returns to state court to exhaust "newly-discovered" claims that: (1) the trial court erred by not holding a competency hearing after learning that Petitioner had attempted to commit suicide before trial; and (2) trial counsel was ineffective for failing to investigate Petitioner's mental health history. (Motion to Stay at 3-4.) That motion is denied. Although Petitioner appears to argue that he first became aware of the existence of these claims in November 2011, when Respondent lodged Defendant's Sentencing Statement (Lodgment No. 3), (Motion to Stay at 2-4), the factual predicates underlying these claims--that the trial court did not hold a competency hearing and that trial counsel failed to put on any mental health evidence in Petitioner's defense--were obviously known to Petitioner at trial and thus are not new. Thus, even if exhausted, the claims would be untimely. *See Hasan v. Galaza*, 254 F.3d 1150, 1154 n.3 (9th Cir. 2001) (holding statute of limitations begins to run when a prisoner "knows (or through diligence could discover) the important facts, not when the prisoner recognizes their legal significance"). Moreover, the claims are plainly meritless. The trial record shows that Petitioner was present at his trial and that he was able to testify lucidly at length in his own defense. (Reporter's Transcript 460-85, 488-90.) As such, there is no reason to stay this case to allow him to exhaust his claims in the state court. *See Rhines v. Weber*, 544 U.S. 269, 278 (2005) (holding district court may only grant stay request if unexhausted claims are potentially meritorious).

## III.

## RECOMMENDATION

For these reasons, IT IS RECOMMENDED that the Court issue an Order (1) approving and adopting this Amended Final Report and Recommendation, (2) denying the issuance of a Certificate of Appealability, and (3) directing that Judgment be entered denying the instant Petition and dismissing this case with prejudice.

DATED: June 20, 2014.

*Patrick J. Walsh*
_____
PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-State Habeas\SMITH, R 1119\AmendedFinalR&R.wpd